## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DETLEF SOMMERFIELD, | ) | |
| | ) | No. 06 C 3132 |
| Plaintiff, | ) | |
| | ) | Judge Gottschall |
| v. | ) | |
| | ) | Magistrate Judge Cole |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Mr. Sommerfield, a Chicago police officer, alleges that members of the Chicago Police Department ("CPD") discriminated against him because of his religion and national origin and retaliated against him after he complained of the discrimination, all in violation of 42 U.S.C. §§ 1981, 1983 and 2000e, *et seq.* He further alleges that the CPD has deficient training policies, which led to the claimed discrimination and retaliation.

In his Rule 26(a)(2) disclosure, Mr. Sommerfield named James F. Pastor as an expert to testify about the CPD's training/instructional protocols and curriculum on religious and national origin discrimination and about the purpose and quality of the CPD's investigations relating to harassment and discrimination. *See* Defendant's Memorandum in Support of Motion to Strike, Ex. A at 15-16. ("Mem."). The City has moved to strike Mr. Pastor's report and bar his testimony for failing to meet the standards for admissibility under Rule 702, Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Specifically, the argument is

that: 1) Mr. Pastor has failed to establish his qualifications to render opinions on CPD's training and investigation of the plaintiff's alleged damages; 2) Mr. Pastor's opinions are unreliable because they are based exclusively on the plaintiff's and his attorney's version of the facts; and 3) Mr. Pastor's opinions will not be helpful to the fact-finder because they consist of legal conclusions and credibility determinations. (Motion to Strike, at 2).

## I.
### THE ANALYTICAL FRAMEWORK FOR DETERMINING THE ADMISSIBILITY OF EXPERT TESTIMONY

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held that the "general acceptance" test for the admissibility of scientific evidence, which had existed in the federal courts since 1923, was at odds with the liberal thrust of the Federal Rules of Evidence, *Tome v. United States*, 513 U.S. 150 (1995), and their general approach of relaxing the traditional barriers to opinion testimony. *Daubert,* 509 U.S. at 588-89. The Court held that the displacement of the "general acceptance" test by the Rules did not mean that there were no limits on the admissibility of purportedly scientific evidence or that trial judges were disabled from "screening" such evidence.

Under the Rules, trial judges have a responsibility as a precondition to admissibility of proffered scientific evidence to make a determination that rests on a reliable foundation and is relevant to the task at hand. *Id.* at 589, 597. The insistence on reliability helps to ensure the integrity of the judicial process, *cf. Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1340 (7th Cir.1989), and is of such transcendent importance that judges can act *sua sponte* to prohibit testimony that does not pass muster under *Daubert*. See *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1094 (7th Cir.1994); *Miller v. Baker Implement Co.*, 439 F.3d 407, 413

2

(8th Cir. 2006). The primary locus of the obligation to ensure reliability, *Daubert* held, was Rule 702, which at the time provided:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

While discussing several factors which "bear upon the [reliability] inquiry," the Court emphasized that the inquiry is "a flexible one," and that it was "not presum[ing] to set out a definitive checklist or test."[1] The focus is not on the expert's conclusions, but on the underlying methodology. *Id.* at 593-595. To be admissible, scientific evidence must be supported by "appropriate validation." *Id.* at 590. *Daubert* concluded with a ringing reaffirmation of the adversary system and the capability of juries to understand scientific evidence and weigh the credibility of the competing experts, notwithstanding their contradictory conclusions and "dogmatic assertions." *Railroad Commission of Texas v. Rowan & Nichols Oil Co.*, 310 U.S. 573, 583 (1940). Vigorous cross examination, presentation of contrary evidence and careful jury instructions, the Court said, are the traditional and appropriate means of attacking shaky, but admissible evidence. *Daubert*, 509 U.S. at 596. *Accord Smith v. Ford Motor Co.*, 215 F.3d 713, 718-719 (7th Cir. 2000); *Walker v. Soo Line R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000).

The flexibility of the inquiry envisioned by Rule 702, the illustrative nature of the *Daubert* factors, and the considerable leeway a trial judge must have in deciding whether expert testimony

---

[1] The specified factors were: (1) whether a theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation. Although rejecting "general acceptance" as the exclusive test for admissibility, the Court noted that it could be an additional factor that might bear on reliability. 509 U.S. at 593-94.

is reliable, were dominant themes of *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999). The Court held that the basic screening obligation created in *Daubert* to insure reliability of scientific testimony applies equally to testimony based on technical or other specialized knowledge. *Id.* at 141, 147-49. Since the gatekeeping inquiry must be tied to the facts of the particular case, the Court held that a trial court may - but is not required to - consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine the testimony's reliability. But, the Court stressed, those factors, which were meant "to be helpful, not definitive," neither necessarily nor exclusively apply to all experts or in every case. *Id.* at 142. Their applicability will depend on "'the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" The procedure employed will depend largely on the "particular circumstances of the particular case at issue." *Id.* at 150. *Accord Smith*, 215 F.3d at 719 ("The Rule 702 test is a flexible one, and no single factor is either required in the analysis or dispositive as to its outcome.").

Rule 702, as amended, now provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

To gauge reliability, it must first be determined whether the expert is qualified in the relevant field, and whether the reasoning or methodology is valid. *Daubert*, 509 U.S. at 592-93. *Accord United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005). The expert must employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire*, 526 U.S. at 152. And of course, the expert's testimony must be relevant to the task at hand. *Daubert*, 509 U.S. at 591, 599. Just as proof of negligence in the air will not do, *Palsgraf v.*

4

*Long Island RR,* 248 N.Y. 339, 344, 162 N.E. 99 (1928) (Cardozo, C.J.), neither will proof of expertise in the abstract. A Nobel laureate in physics could not help the jury in a medical malpractice case.

*Daubert* cautioned judges assessing a proffer of expert testimony under Rule 702, Federal Rules of Evidence, to be mindful of other applicable evidentiary rules, such as Rule 703, which prescribes the foundations upon which an expert may base an opinion. Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Contrary to Mr. Sommerfield's argument, Rule 703 does not authorize an expert to base an opinion on a lawyer's summaries of deposition testimony. As discussed below, Rule 703 is not an exception to the hearsay rule, nor is it an exception to *Daubert*'s uncompromising insistence that expert testimony must be reliable.

## II.
## ANALYSIS

### A.
### Mr. Pastor's Expert Report

Mr. Pastor's eighteen-page report begins with a recitation of his qualifications as an expert in matters relating to security and police procedures. Mr. Pastor currently serves as an Associate Professor in the Public Safety programs at Calumet College of St. Joseph. He has numerous degrees relating to law enforcement and public policy, including a Ph.D. in Public Policy Analysis. He also

is a licensed attorney and has represented police officers in several employment and discrimination claims, and has worked for the Chicago Police Department in matters relating to discipline of department members and published several articles on policing and security. (Mem. Ex. A, at 1-2). He has been involved in approximately 300 investigative interviews and interrogations involving criminal and administrative allegations. As an Assistant Department Advocate for the Chicago Police Department, Mr. Pastor dealt with legal and policy matters relating to discipline of department members. He has also made numerous professional presentations, published several articles on policing and security, and authored two books: *The Privatization of Police in America* and *Security Law & Methods*. (Mem., Ex. A, at 1-2). He is qualified to give opinions in this case, at least as to certain matters. *See Valentin v. New York City*, 1997 WL 33323099 (E.D. N.Y. 1997)(qualifications of expert similar to Pastor's).

The only documents that Mr. Pastor reviewed in order to prepare his report were the plaintiff's Second Amended Complaint and the summary of depositions by the plaintiff's lawyer. (Mem., Ex. A, at 1). Mr. Pastor devotes eleven pages in his report to reciting his understanding of the "relevant facts" as gleaned from these sources and concludes, among other things, that "the training and instructional approach used by the department was woefully inadequate to address the allegations made by the plaintiff," "the department was deliberately indifferent to religious and national origin harassment," and "a custom and practice exists that allows, acquiesces, and affirms religious and nation[al] origin discrimination and harassment within the Chicago Police Department."

While Mr. Pastor assumes the truthfulness of events favorable to the plaintiff, that is not necessarily an automatic disqualifier, especially in a case like this where the plaintiff's and

6

defendant's versions of events are diametrically opposed. *See Richman v. Sheahan*, 415 F.Supp.2d 929, 943-44 (N.D.Ill. 2006). After all, an expert cannot determine credibility; that is for the trier of fact. *United States v. Scheffer*, 523 U.S. 303, 313 (1998); *Goodwin v. MTD Products, Inc.*, 232 F.3d 600, 609 (7th Cir. 2000). The curative in cases involving conflicting testimony is not exclusion of opinions that assume the truthfulness of a particular version of facts, but cross-examination and jury instructions (that make clear that the expert is not deciding credibility), as the Court stressed in *Daubert*. *See Richman v. Sheahan*, 415 F.Supp.2d 929, 933, 942 (N.D.Ill. 2006) (collecting cases).

If the City's argument were accepted, virtually no expert could give an opinion unless the facts were not in dispute – which almost never occurs – and which would make the case one for summary judgment, not trial. The instant case is quite different from those in which an expert gives an opinion that merely assumes the accuracy of one version of events as testified to by one or more witnesses. Here, the expert is assuming that the selected version has been accurately reported by the lawyer of the party employing him, and no case permits that. Indeed, Mr. Pastor ends his report with the revealing statement under the heading, "Caveat," that his "opinions largely rest on the accuracy of the summaries provided by [plaintiff's] [a]ttorney," and might be different if the summaries were inaccurate. (Mem., Ex. A, at 18).

While the sources of an expert opinion need not be admissible in evidence, they must be reliable, *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 -905 (7th Cir.2007); *Vitterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987); *Soden v. Freightliner Corp.*, 714 F.2d 498, 505 (5th Cir. 1983), for an "'opinion has a significance proportioned to the sources that sustain it.'" *Huey v. United Parcel Service, Inc,.* 165 F.3d 1084, 1087 (7th Cir.1999). Yet, Mr. Pastor's report depends on the assumption that the plaintiff's lawyer's summarizations of certain deposition transcripts is

accurate, and it makes no attempt to show either that the summaries are accurate or that experts in Mr. Pastor's field of expertise reasonably rely on such summaries in forming opinions or inferences upon the subject, even though Rule 703 requires precisely such a showing.

**B.**
**Mr. Pastor's Reliance On Summaries Of Testimony**
**Prepared By The Plaintiff's Attorney Renders His Opinions**
**Unreliable Within The Meaning Of Daubert And Thus Inadmissible**

Acceptance of the notion that an expert can reasonably base his opinion on summaries of deposition testimony prepared by a party's lawyer would effectively eliminate *Daubert's* insistence that an expert's opinion be grounded on reliable information. This conclusion follows from a number of separate but related principles, perhaps the most critical of which is the partisan role lawyers play in our adversary system. Indeed Judge Posner has said that "'[expert witnesses] are the mere paid advocates or partisans of those who employ and pay them, *as much so as the attorneys who conduct the suit.*'" *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 382 (7th Cir.1986) (Emphasis supplied). There is nothing improper about this partisanship. Quite the contrary. Neutrality is for the court, not for those actively engaged in the struggle, and a lawyer representing a party in litigation is expected to be a zealous advocate on behalf of a client to whom is owed undivided allegiance. *Von Moltke v. Gillies*, 332 U.S. 708, 725-726 (1948). Thus, each side is responsible for preparing and presenting its own case, *see Castro v. United States*, 540 U.S. 375, 387 (2003); *Tabaku v. Gonzales*, 425 F.3d, 417, 422 (7th Cir.2005), and is not obligated to warn adversaries, *Manicki v. Zeilmann*, 443 F.3d 922, 927 (7th Cir.2006), or to assist an opponent in establishing its claims. *F.E.L. Publications v. Catholic Bishop of Chicago*, 1989 WL 100006 *3 (N.D.Ill. 1989); *Korman v. Shull*, 184 F.Supp. 928, 936 (W.D.Mich.1960).

Consistent with the role of an advocate in our adversary system, it is assumed that counsel "is supposed to give the evidence a partisan slant." *Philips Medical Systems Intern. B.V. v. Bruetman*, 8 F.3d 600, 606 (7th Cir.1993)(Posner, J.). Indeed, "a partisan scrutiny of the record and assessment of potential issues, goes to the irreducible core of the lawyer's obligation to a litigant in an adversary system...." *Smith v. Robbins*, 528 U.S. 259, 293 (2000)(Souter, J., dissenting). This single-minded devotion to a client's interests – which "follows from the nature of our adversarial system of justice," *Penson v. Ohio,* 488 U.S. 75, 84 (1988) – is incompatible with the neutrality and evenhandedness that are necessary if a summarization of deposition testimony is to have the reliability *Daubert* demands. What the Seventh Circuit said in *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1148 (7th Cir.1993) applies here *mutatis mutandis*:

> The roles of attorney and witness usually are incompatible. A witness is supposed to present the facts without a slant, while an attorney's job is to advocate a partisan view of the significance of the facts. One person trying to do both things is apt to be a poor witness, a poor advocate, or both.

"Under a realistic appraisal of psychological tendencies and human weakness," *Withrow v. Larkin,* 421 U.S. 35, 47 (1975), a lawyer attempting to fulfill his obligations to his client and also trying to summarize depositions with the accuracy required to insure reliability is apt to be a poor summarizer, a poor advocate, or both.

Moreover, since lawyers are not experts in the particular field involved in the case, their summarizations of deposition testimony run the risk of under-inclusion; that is, of inadvertent exclusion (or minimization) of information whose importance might elude the lawyer, but to the expert's trained eye might have spoken volumes – if only it had been included in the summary. Indeed, the very act of summarization of depositions by a party's lawyer to be used as the basis for

expert testimony poses risks to the reliability that *Daubert* and *Kumho Tire* require. If the summarizations consists of the lawyer's notes taken under the pressures of the deposition, they are likely to be incomplete, for reasons obvious to anyone who has ever taken or defended a deposition and tried to take contemporaneous and comprehensive notes. If the summarization comes after the deposition – and is based on notes augmented by memory – the risks to reliability are equally obvious, for memory is selective as well as fallible. *Cf., Kadia v. Gonzales,* 501 F.3d 817, 822 (7th Cir.2007). A deposition transcript suffers from neither of these human limitations. *Cf., Lopez v. United States,* 373 U.S. 427, 439 (1963)(surreptitious recording of conversation between defendant and government agent provided corroborating evidence not "susceptible of impeachment."). Finally, if a summary is based on the transcript, there is no justification for not supplying the deposition transcript, itself.

In the instant case, the plaintiff's counsel summarized 11 of 17 depositions. The shortest of the depositions was 63 pages long, and most of the others were hundreds of pages long. While the 11 summarized depositions spanned 2,649 pages of transcript, the summary apparently was 26 pages long. [2] That is 1% of the available deposition transcript, that the plaintiff's lawyer selectively chose to summarize – hardly a representative sampling of the information that an expert should have wanted to see and which ought to have been reviewed so that an expert opinion would be reliable. In addition, 7 other depositions spanning 956 pages of transcript were not summarized. *See* List Of Deposition Summaries Identified In Plaintiff's Rule 26(a)(2) Witness Report (Docket No. 276).

---

[2] Although the summary does not accompany either Mr. Pastor's report, the plaintiff's briefs or the City's briefs in support of its motion to bar, it may be inferred from Mr. Pastor's report that it was perhaps 26 pages in length, since that is the highest numbered page referred to in Mr. Pastor's report. It is impossible to tell whether what Mr. Pastor describes as a summary is a collection of isolated excerpts from the transcript, a summarization of witness testimony or some subjective amalgam of both.

Although the burden of proving reliability is on the plaintiff, there is no showing when or how the summarizations were prepared or that they accurately reflect what is in the 11 summarized transcripts or that the 6 unsummarized depositions are not relevant to Mr. Pastor's analysis.

Rejecting a lawyer's summarization of depositions as a basis for expert opinion is consistent with the law's wariness of information prepared for litigation. For example, the "firmly rooted exceptions" to the hearsay rule rest on the theory, supported by long experience, that qualifying hearsay declarations may be received into evidence without cross-examination because they are inherently trustworthy. *Lilly v. Virginia*, 527 U.S. 116, 126 (1999); *Varela v. United States,* 481 F.3d 932, 935 (7th Cir. 2007). One conspicuous example is the exception for records of regularly conducted activity. *See* Rule 803(6), Federal Rules Of Evidence; *Palmer v. Hoffman,* 318 U.S. 109 (1943); Michael H. Graham, Handbook of Federal Evidence § 803.6, at 867 (3d ed. 1991).

The exception is based on the fact that since businesses and other regularly conducted activities depend on such records to conduct their own affairs, the employees who generate them have a strong motive to be accurate. Second, routine and habitual patterns of creation lend reliability to the records. But when a document is created for a particular use that lies outside the business's usual operations – especially when that use involves litigation – these guarantors of reliability are absent. Litigation is not a "regularly conducted business activity," Rule 803(6), and thus, documents prepared specifically for use in litigation are, as Judge Frank famously put it, "dripping with motivations to misrepresent." *Hoffman v. Palmer,* 129 F.2d 976, 991 (2d Cir.1942), *aff'd, Palmer v. Hoffman,* 318 U.S. 109 (1943). They are therefore inadmissible hearsay, and the "well-established rule that documents made in anticipation of litigation are inadmissible under the business records exception" comes into play. *United States v. Blackburn*, 992 F.2d 666, 670 (7th Cir.1993). *See also*

*Brauninger v. Motes,* 260 Fed.Appx. 634, 637 (5ᵗʰ Cir. 2007); *United States v. Feliz,* 467 F.3d 227, 234 (2ⁿᵈ Cir. 2006).

Thus, where the records are prepared by a party rather than a clerical or professional employee there may be a strong motive to falsify the records and the district judge may deem them insufficiently trustworthy to be admitted. *United States v. Spano,* 421 F.3d 599 (7ᵗʰ Cir.2005). For example in *Lust v. Sealy, Inc.* 383 F.3d 580(7th Cir.2004), a manager created a memorandum of a conversation with an employee explaining that she was fired for reasons of job performance. The court of appeals concluded that the only purpose was to create evidence for use in Lust's anticipated lawsuit, and that purpose disqualified the memorandum as a business record. *See also Echo Acceptance Corp. v. Household Retail Services, Inc.,* 267 F.3d 1068, 1090 -1091 (10ᵗʰ Cir. 2001)(letters drafted by lawyers in anticipation of litigation were not within the Rule 803(6) exception because the "source of information or the method or circumstances of preparation indicate lack of trustworthiness").

The concern over reliability of documents prepared for litigation also appears in cases dealing with expert testimony and has prompted some courts to add as an additional factor to those articulated by *Daubert* to determine reliability whether the expert testimony was prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work. If the former, the testimony is to be viewed with some caution. *See e.g., Johnson v. Manitowoc Boom Trucks, Inc.,* 484 F.3d 426, 434 (6ᵗʰ Cir. 2007); *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1352 (9ᵗʰ Cir. 1995)(Kozinski, J.).[3]

---

[3] This is the Ninth Circuit's opinion following the Supreme Court's remand in *Daubert.*

It has also been held that an expert opinion based on facts prepared in anticipation of litigation may be deemed unreliable. *See Soden*, 714 F.2d at 503-04 (preparation of statistical data strictly in anticipation of litigation is a factor to be considered in excluding expert testimony). The Fifth Circuit in *Soden* stressed that notwithstanding the wide latitude accorded experts in choosing the sources on which to base opinions, those sources must be shown to be reliable. 714 F.2d at 505. *See also Faries v. Atlas Truck Body Mfg. Co.*, 797 F.2d 619, 623-24 (8th Cir. 1986)(expert opinion based upon statements by unreliable witness not admissible under Rule 703); 3 J. Weinstein & M. Burger, *Weinstein's Evidence*, ¶ 703[03] at 703-16 (1982); 3 D. Louisell & B. Mueller, *Federal Evidence*, § 389 at 661-62 (1979). And the burden is on the proponent of the evidence to make that showing. *Daubert*, 509 U.S. at 592 n. 10; *Wantanabe Realty Corp. v. City of New York*, 2004 WL 188088 at *2 (S.D.N.Y. 2004).

In the instant case, the summaries of the depositions provided to Mr. Pastor were prepared not merely in anticipation of litigation, but in the midst of the case and by the lawyer for one of the parties. Those courts that have considered the issue raised in this case have concluded that summaries of depositions or data prepared by a party's lawyer are not sufficiently reliable that they may form the basis of an expert's opinion. For example, in *In re TMI*, 193 F.3d 613 (3rd Cir. 1999), cited by plaintiff for an unrelated proposition, a doctor attempted to give expert testimony based on summaries of medical histories prepared by employees of the plaintiff's lawyer using questions prepared by the doctor, herself. *See id.* at 683-84, 698. The Third Circuit held that the expert testimony was not admissible because the sources on which it was based were not sufficiently reliable. While the court had concerns with the reliability of the patient's self-reporting of symptoms and the absence of any attempt by the expert to examine or interview the patients, the court also

13

found significant that the non-professionals conducting the interviews were "aligned with counsel for one of the litigants." *Id.* at 698.

In *Crowley v. Chait*, 322 F. Supp. 2d 530 (D.N.J. 2004), the district court refused to permit one of the plaintiff's accounting witnesses to give expert opinion where that opinion was based on summaries prepared by plaintiff's counsel of eight depositions that had been taken in the case.[4] The court said: "[T]o make [the expert] the mouthpiece of these deponents, and to allow him to offer testimony to a jury as to conclusions he has reached on the basis of this highly filtered version of events, is unacceptable." *Id.* at 547.[5] *Lyman v. St. Jude Med. S.C., Inc.*, 2008 WL 2224352 (E.D. Wis. 2008) excluded as unreliable expert testimony on behalf of the defendant where the expert did not independently verify the source and accuracy of plaintiff's sales data but rather accepted the summary of the data he received from the defendant's attorney. Chief Judge Randa quoted *Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 808 (N.D.Ill. 2005) for the proposition that "while Rule 703 was intended to liberalize the rules relating to expert testimony and the bases on which that testimony could be based, it was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." *See Lyman*, 2008 WL 2224352 at *5.

*Loeffel Steel Products* relied on Judge Posner's opinions in *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002), and *In re James Wilson Associates*,

---

[4] There were more than 150 depositions taken in the case. The plaintiff's lawyer selected 8. *See* 322 F.Supp.2d at 545.

[5] Actually, the expert is the mouthpiece not of the deponents, who were subject to cross-examination and whose testimony might be admissible under Rule 804(b)(1) if the deponent is unavailable at trial, but of the lawyer who is the real declarant.

14

965 F.2d 160, 173 (7th Cir. 1992) and on *TK-7 Corp. v. The Estate of Barbouti*, 993 F.2d 722, 731-

34 (10th Cir. 1993). These cases teach that under Rule 703, an expert may rely on hearsay in

formulating his opinion if it is of the type reasonably relied on by experts in the field, and that the

evidence is not admissible for the truth of the matters asserted. *United States v. Gonzales*, 307 F.3d

906, 910 (9th Cir.2002); it is admitted for the limited purpose of informing the jury of the basis of

the expert's opinion. *TK-7 Corp.*, 993 F.2d at 734; *Loeffel Steel Products*, 378 F.Supp.2d at 808.[6]

In *Dura Automotive*, the court recognized that it "is common in technical fields for an expert

to base an opinion in part on what a different expert believes on the basis of expert knowledge not

possessed by the first expert." 285 F.3d at 613. For example, as the Committee Notes to the 1972

Proposed Rule 703 observed, a physician, though not an expert in radiology, may rely for a diagnosis

on an x-ray. *Id.* The Seventh Circuit extrapolated from there to make its point:

> We too do not believe that the leader of a clinical medical team must be qualified as
> an expert in every individual discipline encompassed by the team in order to testify
> as to the team's conclusions. But suppose the soundness of the underlying expert
> judgment is in issue. Suppose a thoracic surgeon gave expert evidence in a medical
> malpractice case that the plaintiff's decedent had died because the defendant, a
> radiologist, had negligently failed to diagnose the decedent's lung cancer until it was
> too advanced for surgery. The surgeon would be competent to testify that the cancer
> was too advanced for surgery, but in offering the additional and critical judgment that
> the radiologist should have discovered the cancer sooner he would be, at best, just
> parroting the opinion of an expert in radiology competent to testify that the defendant
> had x-rayed the decedent carelessly.

---

[6] In *United States v. Leeson*, 453 F.3d 631 (4th Cir. 2006), the expert based his opinion that the defendant was
sane upon statements from two inmates who claimed that defendant had approached them to help him look
crazy. The Fourth Circuit held that the testimony "qualifie[d] for admission under Rule 703" since this was
the kind of information routinely relied upon by clinical psychologists. Possible untrustworthiness of the
declarants and the expert's uncritical reliance on them were matters for cross-examination. *See also, United
States v. Mulder*, 273 F.3d 91 (2nd Cir. 2001)(expert could base opinion on hearsay statements of police
detectives, informants, and contractors).

*Id.* The problem, then, is that the expert is vouching for the truth of what another expert told him - he is merely that expert's spokesman. But, "[a] scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science." *Id.* at 614.[7]

Although they are somewhat different, the risks to reliability that concerned the courts in these cases exist here. Mr. Pastor's opinion depends, as he candidly acknowledged, on the accuracy of the plaintiff's lawyer's several page summary of the thousands of pages of deposition testimony. Like the doctor in *TMI*, Mr. Pastor did not independently verify that the information in the summary was accurate, nor did he review the depositions so that he could conclude that there was nothing not contained in the summaries that might affect his opinion. It seems exceedingly unlikely that the thousands of pages of deposition transcript could be reliably summarized in the few pages given to Mr. Pastor, and it is impossible to know whether in those unsummarized depositions there is information that would have affected Mr. Pastor's ultimate conclusions.

The example posed by Judge Posner in *In re James Wilson Associates,* demonstrates the problem with Mr. Pastor's testimony:

> "If, for example, the expert witness (call him A) bases his opinion in part on a fact (call it X) that the parties lawyer told him, the lawyer cannot, in closing argument, tell the jury, 'see we proved X through our expert witness, A.'" 965 F.2d at 173.

---

[7] By way of example, the court in *Dura Automotive* said that a theoretical economist, who relied on the findings of an econometric study conducted by another economist, would not be allowed to testify if he lacked expertise in econometrics, and the study raised questions that only an econometrician could answer. 285 F.2d at 614. Even Judge Wood, who dissented, agreed with this example. *Id.* at 620. *See also TK-7 Corp.,* 993 F.2d at 732 (the rationale of Rule 703 "is certainly not satisfied in this case where the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction.").

This was the kind of hand-off attempted in *James Wilson Associates,* where an architect attempted to testify to the value of a building based upon a report provided to him by a consulting engineer, who had examined the building. The Seventh Circuit held that the trial judge "was entitled to exclude the architect's evidence as hearsay." *Id.* at 172. The issue was the state of the building, and the expert who had evaluated that state-the consulting engineer-was the one who should have testified. The architect could use what the engineer told him to offer an opinion *within the architect's domain of expertise,* but he could not testify for the purpose of vouching for the truth of what the engineer told him – "of becoming in short the engineer's spokesman." *Id.* at 173. It "is improper to use an expert witness as a screen against cross-examination (though the other side could always call him as an adverse witness, and cross-examine him)." *Id.* (Parenthesis in original).

*TK-7 Corp. v. Estate of Barbouti*, which was cited approvingly in *Dura Automotive*, is also instructive. Dr. Boswell, a financial economist and professor of finance, predicated his calculations of lost profits on sales projections of a Mr. Werber. The district court initially allowed the testimony, but ultimately directed a verdict against the plaintiff (on whose behalf Boswell testified), based on insufficiency of the evidence of damages. Mr. Werber was not called to testify, and the court held that the plaintiff had failed to prove that the projections that Dr. Boswell had assumed to be true were in fact accurate. *Accord International Adhesive Coating Co. v. Bolton Emerson International,* 851 F.2d 540, 546 (1st Cir. 1988).

Had Werber testified, the hearsay problem that concerned the court in *TK-7 Corp.* (and in *Dura Automotive*, and *James A. Wilson*) would not have been present, and the expert testimony would not have been barred. While it was perfectly permissible for the experts in those cases to assume the truthfulness of the evidence on which their opinions were based, it was necessary that

17

there be affirmative proof of the underlying facts. It is only where the assumed version is unsupported that the expert's testimony is objectionable, not because it rests on a credibility judgment, but because, as in *Dura Automotive*, "it rests on air." *See Buscaglia v. United States*, 25 F.3d 530, 533 (7th Cir. 1994) (testimony inadmissible if based on *unsupported* assumptions).[8] Otherwise, the experts were mere mouthpieces for others, and the testimony would rest on air.[9]

To presume the reliability of the plaintiff's lawyer's summarizations of deposition testimony – and allow Mr. Pastor's testimony to be based solely on those summaries – would be an abdication of the screening function *Daubert* and *Kumho Tire* have imposed on district courts. *In re Air Disaster at Lockerbie, Scotland on Dec. 21, 1988*, 37 F.3d 804 (2nd Cir. 1994) provides no support to the plaintiff. The court there affirmed a trial court's ruling to admit expert testimony "summarizing the trial record" and, at times, "us[ing] transparencies to highlight portions of the trial transcripts to which the witnesses referred when they were on the witness stand." *Id.* at 826. The experts, on their direct examination, summarized evidence already in the record and which the jury had heard. The jury could easily ascertain whether the expert's summarizations were accurate, and the experts were subject to cross examination. Thus, there was nothing unreliable about the sources on which their testimony was based, and Rule 703 allows an expert to base an opinion on facts or data perceived by or made known to the expert at the hearing.

---

[8] Significantly, the City has not cited any specific statements that purport to opine on the credibility of any witness. The "Relevant Opinions" section of Mr. Pastor's report assumes a version of the facts to formulate an opinion but does not go further so as to delve into the jury's exclusive credibility-determining power. (*See generally* Mem., Ex. A, at 15-17.)

[9] *Cf. In re TMI Litigation*, 193 F.3d at 677 (3rd. Cir.)("Although *Daubert/Paoli* analysis does not preclude testimony merely because it may be based upon an assumption, the supporting assumption must be sufficiently grounded in sound methodology, and reasoning to allow the conclusion it supports to clear the reliability hurdle.").

Nor is *Elm Grove Coal Co. v. Director, Office of Workers' Compensation Programs,* 480 F.3d 278 (4th Cir. 2007) helpful to Mr. Sommerfield. That case explored whether drafts of expert reports created by an attorney are discoverable notwithstanding the work-product doctrine. They obviously are. A contrary ruling would significantly undercut the jury's ability to evaluate expert testimony. The further conclusion that an attorney's participation in the creation of an expert report does not render the report unreliable, *id.* at 301 n.23, is consistent with the Advisory Committee's Note to Rule 26(a)(2)(B), which recognized that the rule "does not preclude counsel from providing assistance to experts in preparing the reports...." *See Singer v. Guckenheimer Enterprises, Inc.,* 2004 WL 1562859, *6 (E.D.Pa. 2004); *Smith v. State Farm Fire and Cas. Co.,* 164 F.R.D. 49, 51 (S.D.W.Va. 1995).

The claimed justification for giving Mr. Pastor summaries of depositions is that counsel did not have time to give him the depositions, because by the time the expert was hired there were only 12 days left before the report was due under the court's scheduling order. (Pl.'s Resp., at 10-11.). The excuse is singularly unconvincing. Mr. Pastor makes no claim that he could not have reviewed the depositions and prepared a report in the remaining time, and counsel's unsupported statement should not be counted. *Sommerfield v. City of Chicago,* 2008 WL 2020481 at *4 (N.D.Ill. 2008)(collecting cases). This is but another example of Mr. Sommerfield's counsel attempting to speak for others. Moreover, the answer to the dilemma posed by the plaintiff is not to allow an expert to rely on unreliable evidence, but rather to seasonably hire experts and failing that to ask the court to extend the expert discovery cutoff. Doing neither in the hope that the strictures of *Daubert*

19

and *Kumho Tire* could be relaxed is not an option.[10]

No case supports the exception to *Daubert* and *Kumho Tire* proposed by the plaintiff. *Marek v. Moore*, 171 F.R.D. 298, 302 (D. Kan. 1997) certainly does not. That was a case where the court declined to strike an expert's testimony even though the proponent's attorney revised an expert's report before submitting it to opposing counsel because of time pressures. It did so because the court found that both versions of the report were substantively alike, and the expert ultimately was willing to vouch for both versions. *Id.* at 300. [11]

A final point. This is not the first time that the plaintiff's counsel has attempted to use himself as the exclusive evidentiary source for a position. Earlier in the case, he sought to hold the City in contempt for noncompliance with certain orders, which were made in the course of a three-hour hearing on a motion to compel compliance with certain discovery requests. Instead of submitting the transcript of the hearing, the plaintiff submitted his own summary of what he claimed the City had been ordered to do. The summary took the form of a letter to defense counsel. I ruled that the letter could not be a substitute for the transcript, and Judge Gottschall adopted in full that conclusion and underlying analysis. *See Sommerfield v. City of Chicago*, 252 F.R.D. 407, 411 (N.D.Ill. 2008). Before that, Mr. Sommerfield's counsel had chosen his own summary of other rulings in preference to reliable evidence of the rulings he sought to overturn. Judge Filip rejected

---

[10] As the instant case shows, parties who do not pay heed to Shakespeare's injunction – "Defer no time, delays have dangerous ends." Henry VI, Part I (1592) Act III, sc. ii 1.33 – imperil their own interests. The Seventh Circuit is partial to Twelfth Night. *Sanders v. Venture Stores, Inc.*, 56 F.3d 771, 775 (7th Cir.1995) ("'In delay there lies no plenty.'"). No matter. The point is the same.

[11] The plaintiff also argues that Mr. Pastor based his opinion on his own familiarity with the defendant's policy as defendant's former employee. (See Pl.'s Resp., at 4, 6-7). Even if that were so, the factual bases on which Mr. Pastor relied in arriving at his conclusions are based exclusively on the summaries of the depositions, which are not reliable.

that approach, noting that "[p]laintiff's motion is extraordinarily poorly presented. It does not, for example, attach a copy of the rulings it seeks to overturn." *Id.* at 412. The current attempt proves that the third time is not always the charm.

## C.
### The Proper Remedy

What then is the proper relief? This much is clear: the report as it now stands contains opinions that, being based on the plaintiff's lawyer's summaries of depositions, has not been shown to be reliable, and no attempt has been made to show that experts in the field depend upon such summaries, as Rule 703 mandates. Thus, the report must go out. In the usual case that also dooms the expert testimony. But this is not the usual case, for it is certain that there will be evidence adduced at trial on which Mr. Pastor could give an opinion and that evidence is well known to both parties through the exhaustive discovery that has occurred in this case. That evidence will come from the plaintiff, himself, at trial and from other witnesses on both sides either contradicting or corroborating the plaintiff. Also, there will undoubtedly be either live testimony or through depositions introduced at trial that will explore the City's policies and practices relating to the kind of discrimination Mr. Sommerfield has alleged. If there is no such testimony at trial the plaintiff would not have presented sufficient evidence to get to the jury, and Mr. Pastor becomes irrelevant.

The testimony adduced at trial can be made known to Mr. Pastor either through listening to trial testimony or hypothetical questioning and could form the basis of his opinions. *See* Rule 703; *United States v. Crabtree*, 979 F.2d 1261, 1270 (7th Cir. 1992); *Moore v. Ashland Chem., Inc.*, 126 F.3d 679, 690 (5th Cir. 1997). In this way, then, this case differs from *Dura Automotive, TK-7 Corp, James A. Wilson* and *Loeffel Steel,* where there was no (nor would there be any) *admissible,*

21

evidentiary support for the expert's conclusions.

The purpose of an expert report is to facilitate an effective cross-examination, minimize the expense of deposing experts, the shortening of direct examination, and the prevention of ambush at trial. *See Malachinski v. C.I.R.*, 268 F.3d 497, 505 (7th Cir. 2001), *Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico*, 248 F.3d 29, 35 (1st Cir.2001)(and cases cited). While theoretically out of the case, Mr. Pastor's report nonetheless provides sufficient information about Mr. Pastor's opinions to enable the City to take a comprehensive deposition. The City has asked for permission to depose Mr. Pastor, and fundamental fairness demands that it have that opportunity. This course is preferable to allowing Mr. Pastor to submit a new report, which I have the discretion to allow, and will enable the jury to have information that may help it to make a fully informed, merits-based decision, which after all is the desideratum of the whole endeavor. *See* Committee Note to 2000 Amendments to Rule 702("'Trial courts should be allowed substantial discretion in dealing with *Daubert* questions....'").

The plaintiff will suffer no prejudice from this disposition, since the report, itself, would not be admissible at trial even if it were not stricken, for it is hearsay in its most pristine form. *See* Rule 801, Federal Rules of Evidence. While Rule 703 allows an expert to base an opinion on otherwise inadmissible evidence, including hearsay, the Rule is not an exception to the hearsay rule – as *Dura Automotive* conclusively shows – and does not pretend to create an additional exception to the hearsay rule and authorize admissibility of the report at the trial. Indeed, Rule 703, to the extent that it touches upon the problem points in the opposite direction, for it prohibits disclosure by the

22

proponent of the evidence to the jury of the inadmissible bases that underlie an expert's opinion.[12]

It is not an adequate answer to say that once the expert has testified the hearsay rule vanishes. The expert does not testify to his report verbatim, and as to those aspects about which there has been no testimony or testimony in a different form, the hearsay rule should operate with full vigor. To the extent that the expert's report merely repeats the expert's trial testimony, the report is "needlessly cumulative" and thus should be excluded under Rule 403.

The cases generally hold that expert reports may not be received in evidence without violating the hearsay rule or Rule 403. *See e.g., BC Technical v. Ensil* Intern., 2008 WL 163578 at *2 (D.Utah 2008); *In re WorldCom, Inc.*, 377 B.R.77, 107, n. 22 (S.D.N.Y. 2007); *Weiss v. Allstate Ins. Co.*, 512 F.Supp.2d 463, 478 (E.D.La. 2007); *United States v. Kiewit Construction Co.*, 2005 WL 1277953 at *10 (D.Ala. 2005); *Granite Partners v. Merrill Lynch*, 2002 WL 826956 at *7 (S.D.N.Y. 2002); *Aka v. General Motors Corp.*, 942 F.Supp.869 (W.D.N.Y. 1996); *Herrin v. ENSCO Offshore Co.*, 2002 WL 465199 (E.D.La. 2002); *Springer v. K-Mart Corp.*, 1998 WL

---

[12] The hearsay rule and its exceptions are contained in Article VIII, Hearsay, of the Federal Rules of Evidence, while Rule 703 is contained in Article VII, Opinions and Expert Testimony. Rule 703 recognizes that a jury's capacity to distinguish between hearsay and non-hearsay uses of evidence is limited. So too does Rule 403, which authorizes exclusion of relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading a jury. In the context of an expert report containing inadmissible evidence on which the expert has based his opinion, a limiting instruction cautioning the jury about the limited purpose for which the otherwise inadmissible evidence is received runs the risk of being an admonition to perform a mental gymnastic beyond its powers. *Cf. Nash v. United States*, 54 F.2d 1006, 1007 (2nd Cir.1932)(L. Hand, J.). *See also Shepard v. United States*, 290 U.S. 96, 104 (1933)(Cardozo, J.)("discrimination so subtle [as to be a] feat beyond the compass of ordinary minds."); *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 785 (3rd Cir. 1996).

Faithful to the liberalizing thrust of Rule 703, the federal courts have taken an expansive approach to the Rule, even where the underlying basis of the expert's opinion seems prejudicial and requires a level of discrimination by the jury that seems quite high. *See* 4 Weinstein's Federal Evidence, § 703.04[3]. This is consistent with the federal courts' general tolerance for out of court declarations offered for some relevant non-hearsay purpose despite the prejudicial implications of the declarations if considered by the jury for the truth of the matters asserted. These are but general observations and each case must be decided on it its own unique facts.

883318 (E.D.La. 1998);*Gentieu v. Tony Stone Images/Chicago, Inc.*, 214 F.Supp.2d 849, 853

(N.D.Ill. 2002)(Shadur, J.); *WestFed Holdings, Inc. v. United States*, 55 Fed.Cl. 544 (2003), *rev'd*

*in part on other grounds*, 407 F.3d 1352 (Fed.Cir. 2005). *But see NAACP v. A.A. Arms, Inc.*, 2003

WL 2003750 (E.D.N.Y. 2003)(Weinstein, J.)(concluding - without discussion - that as a general

matter the admission of the general report is not redundant and having the report may help the jury).

**D.**
**Mr. Pastor's Qualifications And His Proffered Testimony**

The admissibility of expert testimony is governed by Rule 702. *Naeem v. McKesson Drug*

*Co.*, 444 F.3d 593, 607 (7th Cir. 2006). Expert testimony must be helpful to the trier of fact. In the

words of Rule 702, it must assist the trier of fact to understand the evidence or to determine a fact

in issue. Expert testimony is helpful to the jury if it concerns a matter beyond the understanding of

the average person. *See United States v. Allen*, 390 F.3d 944, 949-950 (7th Cir. 2004); *United States*

*v. Mansoori*, 304 F.3d 635, 653-654 (7th Cir. 2002); *United States v. Young*, 316 F.3d 649, 656-659

(7th Cir. 2002). The standard under Rule 702 is a "liberal one," *AMPAT/Midwest, Inc. v. Illinois*

*Tool Works, Inc.*, 896 F.2d 1035, (7th Cir. 1990), and "notably" so. *Krist v. Eli Lilly & Co.*, 897 F.2d

293, 298 (7th Cir. 1990). Indeed, any "'doubts about whether an expert's testimony will be useful

should be resolved in favor of admissibility.'" *Larabee v. M M & L Int'l Corp.*, 896 F.2d 1112, 1116,

n. 6 (8th Cir.1990) (quoting 3 *Weinstein's Evidence*, ¶ 702[02] (1987)).

However, no expert testimony is needed when the subject matter of the testimony is clearly

within the average person's grasp. *Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004). "Jurors do not

leave their knowledge of the world behind when they enter a courtroom and they do not need to have

the obvious spelled out in painstaking detail." *Dawson v. Delaware*, 503 U.S. 159, 171 (1992). *Cf.*

*Jones v. Hamelman,* 869 F.2d 1023, 1028 (7th Cir. 1989); *Ledford v. Sullivan,* 105 F.3d 354, 360 (7th

Cir.1997)(no expert was needed in a deliberate indifference case where plaintiff experienced nausea,

dizziness, vomiting, a crawling sensation on his skin, emotional and mental regression, and

depression when the defendants deprived him of his medication).

Expert testimony may also be helpful if it assists the jury in understanding facts in the record.

*See United States v. Parra,* 402 F.3d 752, 758-759 (7th Cir. 2005) (expert testimony about modus

operandi for drug dealers helpful even though jury had access to surveillance tapes because it helped

them to evaluate seemingly innocent conduct). Additionally, expert testimony may also assist the

fact-finder by placing the facts in the record in context. *See Lawson v. Trowbridge,* 153 F.3d 368,

376 (7th Cir. 1998) (expert testimony regarding police training helpful to put officers' conduct in

approaching armed suspect in context).

Helpfulness, however, has its limits. An expert may not tell the jury whom to believe, nor

can he make credibility determinations. *Goodwin v. MTD Prods., Inc.* 232 F.3d 600, 609 (7th Cir.

2000). That is exclusively a determination for the jury, who are presumed to be fitted for the task

by their natural intelligence and their practical knowledge of the affairs of life. *United States v.*

*Scheffer,* 523 U.S. 303, 313 (1998). Likewise, expert testimony that contains a legal conclusion that

determines the outcome of a case is inadmissible. *RLJCS Enterprises, Inc. v. Professional Ben. Trust*

*Multiple Employer Welfare Ben. Plan and Trust,* 487 F.3d 494, 498 (7th Cir. 2007)(Easterbrook,

C.J.)[13]; *Good Shepard Manor Found., Inc. v. City of Momence,* 323 F.3d 557, 564 (7th Cir.2003);

---

[13] The court's observations in *RLJCS Enterprises* bear repeating:

> "Argument about the meaning of trust indentures, contracts, and mutual-to-stock
> conversions belongs in briefs, not in "experts' reports." Legal arguments are costly
> (continued...)

4 Weinstein's Federal Evidence, §704.04 (2008). Testimony on discrimination has been excluded because of the legal significance of the term. Weinstein's, *supra* §704.04 [2][b].

Rule 704 of the Federal Rules of Evidence, which precludes objections opinion evidence solely because it may embrace an ultimate issue, cannot sustain the admissibility of legal conclusions by experts.[14] "When the rules speak of an expert's testimony embracing the ultimate issue, the reference must be to stating opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue." *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994). Outcome-determinative legal conclusions do not assist the trier of fact, and thus, are not "otherwise admissible" within the meaning of Rule 704. *West v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997); *Giles v. Rhodes*, 2000 WL 1425046 at *17 (S.D. N.Y. 2000); 29 Wright and Gold, § 6282 at 368, 373. *See also United States v. Sinclair*, 74 F.3d 753, 757-58 n. 1 (7th Cir.1996) (collecting cases).

It is often difficult to distinguish between expert opinions that impermissibly impinge on the jury's function through outcome-determinative legal conclusions and those that merely assist the jury in making their ultimate decision. *Sinclair*, 74 F.3d at 758 n.1 (noting the lack of clarity in the

---

[13](...continued)

enough without being the subjects of "experts' " depositions and extensive debates in discovery, in addition to presentations made directly to the judge. If specialized knowledge about tax or demutualization would assist the judge, the holders of that knowledge can help counsel write the briefs and present oral argument. In this court each side is represented by two law firms, and a professor of law also has signed plaintiffs' brief. Enough!"

487 F.3d at 498.

[14] Rule 704 (a) provides: Except as provided in subdivision (b) [testifying with respect to the mental state or condition of a defendant in a criminal case], testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

opinions as to when an expert may testify on legal issues). Judge Weinstein notes that the admissibility of expert opinion regarding conclusory language depends on how closely the language of the opinion tracks the language of the legal charge:

> Generally, if the expert expresses an opinion using legal terms that follow the statutes related to the tort or crime at issue, it is more likely to be held that the expert is giving a legal conclusion. In contrast, an expert's testimony that uses words that do not have specialized legal meaning is more likely to be admissible.

Weinstein's Federal Evidence § 704.04 (2008) (footnotes omitted). *See Richman*, 415 F.Supp.2d at 946, *et seq. See also Lewis v. Adams County*, 244 Fed.Appx. 1 at *10 (6th Cir. 2007)(expert's opinion that failure to do a particular act rendered the application of deadly force unreasonable and excessive constituted inadmissible legal conclusion).

The inquiry should focus on whether the opinion is phrased in terms that employ legal criteria that the jury does not understand based upon its own experiences in life. This is the problem of "inadequately explored legal criteria." (See Advisory Committee Note to Rule 704). The example chosen by the Advisory Committee's Note illustrates the point. The question of whether a testator had the "capacity" to make a will should be excluded, while the question whether the testator had sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution would be allowed. While both questions employ the same legal term, the difference between them is a matter of the jury's ability to understand answers to the questions.

"Capacity" has a particular meaning in the law of wills that is not intuitively obvious to a layperson. Thus, a simple answer to the first question leaves the jury with nothing to assist it, and they may even attribute to the answer a meaning that the witness did not intend. In contrast, the second question adds a description that explains how the legal test for capacity and thus assists the

27

trier of fact. *Hygh v. Jacobs*, 961 F.2d 359, 363-364 (2d Cir.1992); 29 Wright and Gold,§ 6284 at 381-382.

1.

### Evaluation Of The Helpfulness Of Mr. Pastor's Expected Trial Testimony

Assuming the existence of admissible evidence at trial based on what has been adduced in discovery, Mr. Pastor should be allowed to testify so long as his conclusions will be helpful to the jury. Mr. Pastor has more expertise than the jury in police department complaint and investigation procedures in cases involving discrimination, and depending on what he has to say, his testimony could assist the jury in the sense envisioned by Rule 702. Of course, merely repeating uncontroverted testimony by witnesses at trial would be cumulative and thus not helpful. *United States v. Fullwood*, 342 F.3d 409, 413 (5th Cir. 2003);[15] *Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 370 (4th Cir. 1986); *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). But these are decisions that cannot be made in the abstract, and are more properly decided at trial where the decision will be informed by the ebb and flow of testimony.

In light of the framework outlined in the prior sections, the analysis now turns to the specific statements in Mr. Pastor's report. The section of Mr. Pastor's report entitled "Training/Instruction Related to Religious and National Origin Discrimination" begins:

---

[15] "[I]n the light of the above-described dangers [allowing the Government to repeat its entire case-in-chief shortly before jury deliberations, danger of confusion to jury, danger that credibility of summary witness may be substituted for the credibility of the evidence summarized] and the seemingly increased use of such witnesses by the Government, we strongly caution, once again, against use of summary witnesses in this fashion, especially in a non-complex case. While such witnesses may be appropriate for summarizing voluminous records, as contemplated by Rule 1006, rebuttal testimony by an advocate summarizing and organizing the case for the jury constitutes a very different phenomenon, not justified by the Federal Rules of Evidence or our precedent. For example, summary witnesses are not to be used as a substitute for, or a supplement to, closing argument." 342 F.3d at 413.

This aspect of my opinion is related to the training/instructional protocols and curriculum of religious and national origin discrimination. In response to the plaintiff's complaint, the city does little to counter or refute the allegations raised in the complaint. Based on the testimony of witnesses, including the city's rule 30 (b)(6) witnesses, it appears that the training and instructional approach used by the department was woefully inadequate to address the allegations made by the plaintiff. In coming to this opinion, it is important to take into account the factual analysis presented above.

Of course inadequacies in training are proper subjects for expert testimony. Only where a city's failure to train "evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Berry v. City of Detroit*, 25 F.3d 1342, 1346 (6th Cir.1994). The Court in *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 407- 408 (1997), put it this way:

We concluded in *Canton* [*v. City of Harris*] that an "inadequate training" claim could be the basis for § 1983 liability in "limited circumstances." *Id.,* at 387. We spoke, however, of a deficient training "program," necessarily intended to apply over time to multiple employees. *Id.,* at 390. Existence of a "program" makes proof of fault and causation at least possible in an inadequate training case. If a program does not prevent constitutional violations, municipal decision makers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action-the "deliberate indifference"-necessary to trigger municipal liability. *Id.,* at 390, n.10 ("It could ... be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need"); *id.,* at 397 (O'Connor, J., concurring in part and dissenting in part) ("[M]unicipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations ..."). In addition, the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the "moving force" behind the plaintiff's injury.

If the complaint to which Mr. Pastor refers is the complaint in the case, Mr. Pastor's

conclusion that the City has done "little to counter or refute the allegations raised in the complaint"

is inadmissible. It is simply a legal argument, not an expert opinion. The same is true as to the

conclusion that the training and instructional approach used by the department was "woefully

inadequate to address the allegations made by the complaint." The plaintiff cites no cases and we

are aware of none holding that an expert can give testimony that refers generally to the allegations

in the complaint, which are implicitly assumed by the expert to be true. Mr. Pastor's subjective

conclusions will not assist the jury, but simply tell it what to decide. Stating that the department

policies were inadequate are admissible if tied to specific inadequacies other than generally to the

"allegations" in the complaint. But in its present form it is impermissibly vague and serves no

purpose other than communicating Mr. Pastor's view of how the verdict should read.

     Mr. Pastor's next conclusion is about the cause of damages and the quality of training and

instruction by the defendant:

> It is my opinion that the failure of the department to provide training and instruction
> lead directly to the damages sustained by the plaintiff. In essence, the department
> provided minimal and ineffective training and instruction designed to address likely
> and significant discrimination posed against the plaintiff. The fact that such training
> and instruction was offered only during the recruit curriculum (which for the harassed
> was about 26 years prior to the harassment), during promotional training (which for
> the harassed was 8 years prior to the harassment), and during "streaming video"
> instruction. This last "method of training" is so limited as to be non-existent.

> Based on the testimony of both fact and Rule 30 (b) (6) witnesses, the viability of
> streaming videos leave me to the following conclusions. First, the subject matter of
> the videos is limited to "sexual harassment." It is clear that the discrimination and
> harassment in this case is not related to sexual harassment. As such, these short
> videos do not address religious and national origin discrimination. Second, even if
> one believes that the streaming videos may address training and instructional
> remedies, the "system" of implementing this video leaves more questions than
> answers. For example, the record reveals that the department cannot determine who
> received this training, when they received it, and what the specific provisions are

contained in the training. In addition, the department has not shown that it can ensure that all employees are included in said training videos, as they apparently cannot account for "make-up" training when an officer is absent for any number of reasons. Consequently, I conclude that the streaming videos provide little, if any, substantive training and instruction for Chicago Police personnel.

(Def.'s First Br., Ex. A, at 15-16.)

The statement that "the failure of the department to provide training and instruction lead directly to the damages *sustained* by the plaintiff" (emphasis supplied) is inadmissible, for it posits that Mr. Sommerfield has in fact sustained damages, and Mr. Pastor is not qualified to say whether Mr. Sommerfield suffered "humiliation, embarrassment, insult and emotional suffering" as a consequence of the City's alleged acts and omissions. (Sec. Am. Compl. ¶¶ 46, 67, 89, 158, 183.). *Richman*, 415 F.Supp.2d at 941. Moreover, the jury does not need Mr. Pastor to assist it in deciding whether Mr. Sommerfield suffered as he claims and, if so, to what extent—nor is he qualified to do so. Of course, competent witnesses may testify to his emotional suffering. *See e.g., O'Sullivan v. City of Chicago*, 474 F.Supp. 2d 971, 979-82 (N.D. Ill. 2007).

Mr. Pastor is, however, qualified to talk about what the City's training consisted of and in what way it is deficient to address the kind of discrimination about which Mr. Sommerfield has (and will) testify about. Mr. Pastor may also testify about what he perceives to be missing from the streaming video instruction -- if, in fact, he has viewed the videos or if there is a sufficient evidentiary predicate laid at trial as to their content so that he can opine on them (although the latter seems unlikely).[16] He is also qualified to say whether the videos that were shown addressed national origin discrimination and to express an opinion on the extent to which officers are exposed to this

---

[16] Apparently, the defendant, at times, subjects its personnel to a streaming video entitled "Keeping the Department Harassment Free." (Def.'s First Br., Ex. A, at 12.)

31

instructional device and whether the frequency of that exposure deviates from some objective standard.

While it could be argued that the jury could figure out what is included and excluded from the teaching aids without Mr. Pastor's help, his testimony could help them in focusing on and better understanding the adequacies and inadequacies of the City's training methods. Mr. Pastor, however, may not say that the system of implementing the video "leaves more questions than answers." There is nothing helpful about this subjective and imprecise assessment, and exposing the jury to this sort of testimony will not advance in any meaningful way their informed analysis of the issues they will be called upon to resolve at trial. He can on a point-by-point basis explain what is missing from the videos, however.

The statement beginning, "the department provided minimal and ineffective training and instruction designed to address likely and significant discrimination posed against the plaintiff," presents a harder question. (Def.'s First Br., Ex. A, at 15.). To say that the instruction was "minimal and ineffective" is admissible. These are commonly understood terms and do not convey a legal conclusion. The second half of the sentence beginning with "likely," however, is a different matter. It subtly conveys to the jury Mr. Pastor's conclusion that Mr. Sommerfield in fact suffered the discrimination claimed, and that amounts to a credibility determination, which is not only impermissible, but, by definition, of no help to the jury. Mr. Pastor's conclusion that the subject matter of the streaming video is limited to sexual harassment may be of some help to the jury and should be allowed. It will be for Judge Gottschall to say whether this conclusion would be needlessly cumulative and thus excludable under Rule 403 if, in fact, Robert Floris testifies to that fact. (Def.'s First Br., Ex. A, at 12). The City should take note however that Rule 403 does not set

32

a predefined limit of 1 on the number of witnesses who can testify to any given fact. What a lifeless, empty, and awkward thing a trial would be if that were the case.

The greater problem with Mr. Pastor's testimony about the video is that he did not view it but accepted the word of a witness who did. The plaintiff has not even attempted to show that experts in the field reasonably rely on someone else's evaluation of training videos. However, his opinion regarding the "system" of delivering the video can assist the trier of fact in determining what a generally accepted practice might look like (i.e. keeping track of persons that have received the training and having a mechanism for making sure that officer's have make-up training when absent from original training). *See Monfils v. Taylor*, 165 F.3d 511, 519-20 (7th Cir.1998) (noting testimony of expert who opined on whether an officer followed generally accepted practices and the specific policy of the police department).

In the passage that follows, Mr. Pastor criticizes the infrequency of the formal training other than video, condemns several witnesses for not recognizing discrimination, and concludes that the department was deliberately indifferent to religious and national origin discrimination:

> Related to this conclusion, the fact that the only other formal training occurs at the time of the initial recruit and any during subsequent promotional curriculum training, the infrequency of this training is problematic, at best. Indeed, based on the record, it appears that key witnesses and supervisors could not articulate what this training consists of. Nor could these individuals even recognize blatant discrimination when asked to do so. The numerous examples of potential discrimination were seen as not being problematic nor were they deemed violative of department policies. These obvious examples of discrimination were viewed by these key supervisors with such irrational detachment that it defies explanation. The only conclusion I can reach is that the department was deliberately indifferent to religious and national origin discrimination and harassment. Consequently, the failure to provide appropriate training and instruction proximately lead to the acquiescence and ratification of inappropriate discrimination and harassment, and ultimately to the damages asserted by the plaintiff.

33

(Def.'s First Br., Ex. A, at 15-16.)

Mr. Pastor's statement characterizing the infrequency of training as "problematic, at best" is excluded. That imprecise characterization does not speak to what constitutes a proper frequency of formal training or otherwise help the trier of fact. The statement relating to failure to recognize "blatant discrimination" should be excluded because it is effectively a legal conclusion, as is the statement about acquiescence and ratification. Mr. Pastor can testify to the reactions of officers to specific situations, however, and he can opine on the relationship of those reactions to the presence or absence of training by the CPD.

The final three sentences of this portion of Mr. Pastor's proposed testimony are inadmissible. First, it is not for Mr. Pastor to say that the examples on which he relies are "obvious examples of discrimination." That conveys a legal conclusion. Second, to say that they were viewed by superiors with such "irrational detachment that it defies explanation" is an argument not an expert opinion. Of course, testimony about the reaction and whether this deviates from a prescribed norm and is linked to the claimed infrequency of instruction about discrimination is permissible.

Third, the jury will be instructed on what constitutes deliberate indifference, which requires proof of more culpable conduct than gross negligence, *City of Canton v. Harris*, 489 U.S. 378 (1989); *Berry v. City of Muskogee, Okl*, 900 F.2d 1489, 1496 (10th Cir.1990), and Mr. Pastor's opinion that the CPD was "deliberately indifferent" to religious and national origin discrimination and harassment" is a legal conclusion and inadmissible. *See Haley*, 86 F.3d at 645. ("[Expert] was not allowed to testify regarding the dictates of deliberate indifference law . . . ."); *Egebergh v. Village of Mount Prospect*, 2004 WL 856437, at *2-3 (N.D. Ill. 2004)(affirming limitation of expert

testimony at trial and noting "[w]hether defendants demonstrated deliberate indifference, however, was a question for the jury alone."). *Accord Woods v. Lecureux*, 110 F.3d 1215 (6th Cir. 1997) (affirming exclusion of testimony describing prison official's conduct as "deliberately indifferent" because it ran the risk of interfering with the jury instructions and depended on the official's state of mind); *Berry v. City of Detroit*, 25 F.3d 1342, 1353-54 (6th Cir. 1994) (expert in § 1983 case not allowed to testify that police department was "deliberately indifferent"); *Bradley v. City of Ferndale*, 148 Fed. Appx. 499, 507-08 (6th Cir. 2005) (unpublished opinion)(expert may testify as to internal procedures but may not testify that defendants acted with "deliberate indifference"). *But see Heflin v. Stewart County*, 958 F.2d 709 (6th Cir. 1992) (divided panel affirmed admission of expert witness characterization of prison official's conduct as "deliberately indifferent," because testimony "merely emphasized the witness's view of the seriousness of the defendants' failures").

The opinion that the failure to provide appropriate training "proximately" lead to "discrimination" and "damages" asserted by plaintiff is inadmissible. It is a legal conclusion and will not be helpful to the jury, which is as capable as Mr. Pastor of determining whether the CPD's acts and omissions resulted in the harm claimed by the plaintiff. *Cf. Halcomb v. Washington Metropolitan Area Transit Authority,* 526 F.Supp.2d 24, 27 (D.D.C. 2007)("'[A]n expert may offer his opinion as to facts, that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied.'").

Part II of Mr. Pastor's opinion section is entitled "Investigation was not designed to fetter out discrimination & harassment." It begins with the following conclusions:

> Based on the evidence from the record, I conclude that the department did not desire to determine if discrimination and harassment was manifest in the 8th district. Nor did the department seek to sanction those who commit such discrimination and harassment. The evidence to this conclusion is as follows.

(Def.'s First Br., Ex. A, at 16).

This conclusion ascribes to the CPD an actual subjective mental state. Just as "judges have no way of crawling into peoples' minds," Posner, Overcoming Law, 276 (1995), neither does Mr. Pastor, and the above conclusion is inadmissible. Moreover, it is impossible to determine what Mr. Pastor means when he says that the department was unconcerned about whether discrimination "was manifest" in the Eighth District. This sort of oblique statement will not assist the jury. Finally, the jury is as qualified as Mr. Pastor to assess the acts and omissions of the CPD and determine whether it sought to sanction those who discriminated against of the officers in the Eighth District.

In the next passage, Mr. Pastor opines on whether the defendant's maintained a custom and practice of performing deficient investigations:

> Based on the evidence form the record I conclude that the department has a custom and practice of performing deficient investigation of harassment and discrimination. First, no policy or custom to interview the victim, harassed, witnesses within a certain time fame. In the instance [sic] case, the investigation was not completed until about three years. During the investigation, the investigator regularly informed his supervisor of the process of the investigation. Thus, the supervisor was aware of the excessive length of the investigation. Indeed, Lieutenant. Clark testified that she had approved other investigations taking 1-2 years to complete. Further, no policy exists to protect the victim during the investigation from harassment, discrimination and retaliation. No policy exists to protect the confidentiality of victims of harassment, discrimination and retaliation claims.
>
> In the instance [sic] case, the plaintiff's claims of harassment and discrimination were public knowledge, and known by supervisors and most officers in the district. Along with the plaintiff, at least two other officers complained of harassment by the accused sergeant. Yet nothing was done to quicken the investigation or remedy this

victimizing situation, so that the accused sergeant would not have the ability or freedom to continue the victimization of the plaintiff and other officers. No policy exists to interview the subordinates of the accused supervisor, or other supervisors on the same watch or district of the accused. No policy exists to inform the victim, the accused, or the witnesses about the investigation and of the results of such, when it was finally completed.

(Def.'s First Br., Ex. A, at 16-17).

Mr. Pastor's conclusion regarding custom and practice of performing deficient investigations is based in part on his statement that the investigation in the instant case was excessive in length. But the only basis for that conclusion is that "other investigations" have taken less time, perhaps a year or two. But that alone proves nothing. Perhaps the other investigations proceeded at too rapid a pace or were less complex, and without a demonstration that all the investigations were comparable in terms of complexity, number of witnesses, etc., any comparison is meaningless. As courts have said in other contexts, care must be taken to be sure that the comparison is one between " 'apples and apples' rather than one between 'apples and oranges.'" *Donnelly v. Rhode Island Board of Governors for Higher Education,* 929 F.Supp. 583, 591 (D.R.I.1996). *Compare Dandy v. United Parcel Service, Inc.,* 388 F.3d 263, 274 (7th Cir.2004)("This court has held that an employee has failed to prove that she was "similarly situated" to her comparitors when she did not present evidence that she and coworkers shared the similar "attributes, experience, education, and qualifications relevant to the position sought...."); *Lehrman v. Gulf Oil,* 500 F.2d 659, 667 (5th Cir.1974), *cert. denied,* 420 U.S. 929 (1975)("the business used as a standard must be as nearly identical to the plaintiff's as possible."); ABA Section of Antitrust Law, Antitrust Law Developments, 877-879 (5th ed.2002)(and cases cited). Moreover, the fact that other investigations took less time and thus were presumably

proper, contradicts rather than supports Mr. Pastor's conclusion that the City has a policy and practice of deficient investigations.[17]

Mr. Pastor may testify about the absence of policy to protect the confidentiality of victims of claimed discrimination and that no policy exists to interview subordinates of the accused supervisor or to inform the victim about the investigation and results of the investigation when it is completed. Mr. Pastor's opinion does not purport to state a legal opinion about discrimination but rather uses the term in its commonly understood context and thus is permissible. *See Richman, supra.*

The remaining paragraphs of Mr. Pastor's report discuss the specific circumstances of the plaintiff's complaint and attempt to draw a conclusion on the defendant's policies in general:

> The accused sergeant says he was never disciplined. Indeed, the department allowed him to retire without penalty over three years after the complaint was filed with internal affairs. This sends the wrong message to other employees intending to discriminate and harass. Furthermore, the plaintiff complained to several supervisors, and none of them did anything to stop the discrimination and harassment. Indeed, they did not even report the discrimination and harassment to their supervisors. In short, the department policies, or lack thereof, and custom and practice demonstrate a reckless disregard and deliberate indifference to investigations relating to national origin and religious discrimination and harassment.
>
> For the above reasons, I conclude that a custom and practice exists that allows, acquiesces, and affirms religious and nation origin discrimination and harassment within the Chicago Police Department.

---

[17] Three-year investigation can indicate misconduct and pretext on the part of the CPD. *See O'Sullivan v. City of Chicago,* 478 F.Supp.2d 1034, 1038, 1040 (N.D.Ill.,2007)(942-day investigation found by the jury to be part of retaliatory efforts against the plaintiffs: "Here, that unlawful discrimination consisted of, among other things, the issuance of CRs against the plaintiffs and subjecting them to Garcia's intolerably protracted investigation, with all its purposeful uncertainty."). *See also O'Sullivan ,* 474 F.Supp.2d at 976-77.

(Def.'s First Br., Ex. A, at 16.)

The statements in this excerpt must be excluded. The first four sentences impermissibly make legal conclusions that the department discriminated against and harassed the plaintiff. The final two sentences, which opine that the department's policies "demonstrate a reckless disregard and deliberate indifference" and that a practice exists that "affirms religious and nation origin discrimination and harassment," contain legal conclusions similar to those cited above. Therefore, they are excluded. The statement that allowing the accused sergeant to retire "sends the wrong message" to potential discriminators and harassers is merely an expression of Mr. Pastor's personal policy judgment and is excluded. Mr. Pastor may testify that the plaintiff's complaints to supervisors went unheeded and none of them did anything to stop the behavior about which Mr. Sommerfield complained – assuming of course that there will testimony at trial to support these facts.

In *Valentin v. New York City*, 1997 WL 33323099 (E.D.N.Y.,1997), Dr. Leinen, an expert for the plaintiff, opined about several alleged incidents of retaliation taken by the Housing Police against the plaintiff. All were, he concluded, "consistent with patterns of sexual harassment and/or retaliation that I have either witnessed or personally heard about." *Id.* at * 24 -25. He also concluded that the plaintiff's mediocre evaluation was retaliatory and would ultimately impede Valentin's chances for advancement within the Department. These opinions were deemed inadmissible, even though the Federal Rules of Evidence allow a qualified expert to testify as to inferences to be drawn from the facts, including inferences relating to the ultimate issue in the case. See Rules 702, 704(a).

However, testimony that embraces an ultimate issue should not be admitted when it contains a legal conclusion that "'convey[s] the witness's unexpressed, and perhaps erroneous, legal standards to the jury.'" *Torres v. County of Oakland,* 758 F.2d 147, 150 (6th Cir. 1985). Thus, the Second

39

Circuit has generally not permitted experts to render an ultimate opinion when the opinion is couched as a legal conclusion. *See, e.g., In re Air Disaster at Lockerbie Scotland*, 37 F.3d at 827 (finding that an airline security expert who stated his personal conclusion that airline had violated safety regulations "crossed the fine line between a permissible conclusion as to an ultimate issue of fact and an impermissible legal conclusion"); *United States v. Scop*, 846 F.2d 135, 139 (2d Cir.1988) (holding that an expert's statements may not invade "'the province of the court to determine the applicable law and to instruct the jury as to that law'").

These principles led the district court in *Valentin* to allow the expert to testify that the things that were done to the plaintiff were not normal police procedures since Dr. Leinen was qualified to make that judgment and his testimony would assist the trier of fact. Even when jurors are well-equipped to make judgments based on their own knowledge and experience, expert testimony can still be helpful by bringing specialized knowledge that could lend support to a jury's inference and generally be helpful to the jury. *See United States v. Taylor*, 18 F.3d 55, 59-60 (2d Cir.1994), *cert. denied*, 512 U.S. 1226 (1994). However, since it would be up to the jury to determine whether these actions constitute sexual harassment, Dr. Leinen's conclusions that these alleged incidents are consistent with a pattern of sexual harassment or retaliation were held inadmissible.

The district court also held that he should not be permitted to testify that defendants' actions were without justification and were done to conform to an alleged pattern of sexual harassment and retaliation. *See Hygh*, 961 F.2d at 364 (in a Section 1983 action, an expert's opinion that a police officer's conduct was not "justified under the circumstances," and "totally improper" intruded into the jury's domain by telling the jury what conclusion it should reach). Thus, Dr. Leinen was not permitted to testify as to whether specific acts taken against the plaintiff constitute retaliation and/or

sexual harassment. He was, however, allowed to opine on whether specific procedures or actions are consistent with generally accepted police practices. So too in the instant case.

E.

**The Defendant's Motion To Strike Is Not Precluded By Local Rule 37.2**

Finally, there is the cursory argument that the City violated Local Rule 37.2 by failing to have any discovery conference with the plaintiff before filing its motion, and therefore, the motion should be denied. Local Rule 37.2's requirement that parties attempt to resolve disputes before they may apply to the court for resolution of the problem applies only to motions "for discovery and production of documents." The defendants are not seeking any discovery. They are seeking to strike plaintiff's expert's opinions as unreliable under *Daubert* and the Federal Rules of Evidence. The plaintiff's argument ignores the plain language of the Rule and its inherent limitations.[18]

**CONCLUSION**

For the foregoing reasons, the defendant's motion to strike plaintiff's expert report and bar expert from testifying at trial is GRANTED in part and DENIED in part. The report is stricken, but the City may take Mr. Pastor's deposition within the next 30 days.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: November 3, 2008

---

[18] Local Rule 37.2 provides: "To curtail undue delay and expense in the administration of justice, this court shall hereafter refuse to hear any and all motions for discovery and production of documents under Rules 26 through 37 of the Federal Rules of Civil Procedure, unless the motion includes a statement" detailing counsel's attempts to resolve the dispute.